On behalf of the Avalon, Ms. Yasmine Eakin. On behalf of the LA, Ms. Dianne Campbell. Thank you. Ms. Eakin, you may proceed. If you may please the court, my name is Yasmin Eakin and I represent the Avalon Aaron Clarke. Your honors, our brief raises four issues, but for purposes of this argument, I intend to focus on the trial errors beginning with the jury instruction issue and then the co-conspirator statements. I will stand on the arguments in the brief for the other two issues unless this court has any questions as to those. As to the jury instruction issue, Mr. Clarke was denied a fair trial where the instruction on the defense of withdrawal was given at the state's request and over the objection of defense counsel. Now on review, the issue is whether the instructions given to the jury considered as a whole fully and fairly announced law applicable to the theories of the state and the defense. And at trial, the state's theory was that Mr. Clarke was guilty under a common design theory of accountability. And the defense theory was that Mr. Clarke was not guilty because he was merely present at the scene and he did not share with his co-defendants their criminal intent or common purpose to commit the offenses. There was evidence showing that Mr. Clarke was at the scene during the alleged kidnapping and subsequent beating of victim Michael Johnson. But he never physically touched Mr. Johnson and at one point he told the principal offenders to stop. Based on this evidence, the state requested IPI 5.04, which defines a legal withdrawal for purposes of accountability. And that instruction states that a person is not legally responsible for the conduct of another if, before the commission of the offense is charged, he either terminates his effort to promote or facilitate the commission of the offense and wholly deprives his prior efforts of effectiveness in the commission of that offense, or gives timely warning to the proper law enforcement authorities, or makes a proper effort to prevent the commission of that offense. Why does a defendant's theory of defense drive the court's duty to instruct the jury properly? I mean, are we not assuming the validity of the theory by not instructing on that? It is, well, I guess to instruct on this specific instruction on withdrawal, this is a defense instruction. And so to instruct on withdrawal based on the state's theory, this wasn't the state's theory at trial. The state's theory wasn't Mr. Clarke participated but then he effectively withdrew, so let's give an instruction on that. I mean, if that is the state's theory, then they should have that instruction. But that's what the instruction is for. The instruction is for when the defendant admits participation in the offense but then says that the trier of fact could find that he performed these specific steps, and therefore he's absolved of legal responsibility for the acts of others. I know that's what Hammond says, but does the committee comments actually say this is a defense instruction and is to only be given at request of a defense? No, it doesn't. It says that it should be given when there's evidence of withdrawal. Any evidence? Is that the way? Or some evidence? Well, that's what the case law jury instructions in general say, that if there's any evidence or some evidence, the instruction should be given. If there is any way to say that this is a state instruction, that the state couldn't ask for this instruction, even though the instruction is basically a functional equivalent of an affirmative defense because you're admitting the acts but denying responsibility for them based on these steps. In this case, there wasn't even any or some evidence to support this instruction. If defense counsel would have submitted this instruction, it would have been refused. There was no evidence telling the other co-defendants to stop after the offense was well underway would not warrant this instruction in any case. So it was improper for that reason as well. Did he tell them to stop before the assault with the beer bottle? He didn't tell them. I'm not clear in terms of the time of that. He told them to stop clearly after the kidnapping had occurred. It was in the house, wasn't it? Wasn't it in the house where he told them to? Exactly. So the actual kidnapping had already occurred. They were in the house. The beating of Mr. Johnson had already started. And the law is that the warning, the withdrawal has to be timely. How does the jury know that? You've got 12 citizens out there. Do they know the law? No, they don't know the law. And so they need to be properly instructed as to the law. Well, what I'm saying is the state's concern at that point, I'm sure, was that some jury might see that, some layperson might see that as some type of withdrawal, even though it doesn't satisfy the legal requirement of withdrawal, but some jury or citizen might see that as a withdrawal. A citizen might see that as withdrawal in the abstract, but that doesn't mean that you instruct them incorrectly in the law. The law is that a legal withdrawal, for a defendant to be absolved of the responsibility of a legal withdrawal, there are very specific steps that he must take, and those didn't occur. So the jury may think that in the abstract, but giving this instruction does not clarify any confusion. It adds to their confusion. It misleads them into believing that what occurred here was a legal withdrawal when, in fact, it was not. That's how this instruction was incorrect in this sense, because it's not a correct statement of the law. And that's where the prejudice lies, is that the jury was tasked with assessing the defense theory, that Mr. Johnson was not liable for these offenses because he was merely present, and the state's theory that he was accountable, that he was more than merely present, but they weren't given the proper legal framework for assessing that because with this instruction, the jury is basically told even if Mr. Johnson was merely present, he was required to prevent the act from occurring and report it to proper authorities, even though that's not what the law is. So the jury may have weighed the evidence and found that Mr. Clark was only merely present and therefore wasn't accountable for the offenses, but he didn't take these additional steps. So as they follow the reverse of what the instruction says, the instruction says a person is not legally responsible if he takes these steps. So the clear import of the state's argument to the jury was, well, he is legally responsible because he didn't take these steps. And that's not what the law is. That's simply a misstatement of the law. Doesn't this instruction basically assume that the state had proven accountability? It does assume that the state has proven accountability, but then it's for the defense to request the instruction to say. So withdrawal is somewhat like akin to an affirmative defense. It is. I would say it is the functional equivalent of an affirmative. And your position is your client did not at any time agree that he was accountable for the actions of others. That's right, Your Honor. And again, when counsel objected to the instruction, that is exactly what he said. He argued that his theory was that Mr. Clark did nothing to promote or facilitate the offense and was merely present, and therefore he didn't have a responsibility to terminate alleged efforts. But unfortunately with this instruction, the jury is at best confused when they see these instructions on accountability in front of them. In fact, defense counsel was able to get a non-IPI that said mere presence does not establish guilt. The state was able to get a non-IPI which says mere presence plus other factors can establish accountability. And then they have this third one saying a person is not legally responsible if they take these steps. But then the state uses it to say he is legally responsible because he didn't take these steps, and that's just not the law. So because the jury was not given this proper legal framework, there can be no assurance that they reached the correct conclusion in this case. Therefore, Mr. Clark was denied his right to a fair trial by a properly instructed jury, and we ask that this court reverse his conviction and remand for a new trial for that reason. The second issue, Mr. Clark's theory that he was merely present and not accountable for the offense was also undermined by the improper admission of co-conspirator acts and declarations of concealment that occurred one and a half to two months after the offenses had been completed. Under the co-conspirator exception to the hearsay rule, acts and declarations of one co-conspirator are admissible against other co-conspirators where they are made during the pendency of and in furtherance of the conspiracy. And if the acts and declarations fall under this exception, they are actually not hearsay. And this exception also includes evidence of subsequent efforts at concealment, but only if those efforts are proximate in time to the commission of the offense. And in my brief, I show there's cases that have found a day after or hours after the offense, efforts at concealment are admissible, but anywhere from five days to 20 days to three months after the offense, the courts have found that those events are not proximately related to the original conspiracy and therefore should not have been admitted. Can you tell us why this is not harmless error in light of the evidence, including the defendant's admissions to Buzzard and Walton? It's not harmless error because, again, we have the two theories. The defendant's theory, I'll address those more specifically, actually, Your Honor. In light of the defendant's admission to Buzzard, his admission was that he participated in the offense, but there was no indication that he participated in the act of concealment that Buzzard also testified to that occurred with his brother. That's some of the evidence that could theoretically be disregarded as improper. Right. But certainly his admissions to Buzzard would be admissible. Right. But Buzzard, all of the state witnesses had credibility issues. Buzzard, you know, candidly testified that, you know, he was hoping for favorable treatment because he himself was charged with a drug offense at the time of his testimony. Willie Walton was a jailhouse informant who spoke to the police initially on January 4th, and Detective Schroeder, who said that he was the one who spoke with Willie Walton, said that he told Walton to go back and try to get more information from Clark. And Willie Walton's own description of what Clark told him was inconsistent with what even the victim, Michael Johnson, said happened. He said that, you know, Clark told him that he was involved, that he was involved in the beating of Johnson, that they messed up Johnson, that they sexually assaulted him. And even Johnson said that Clark was merely at the scene and didn't participate in any of those acts. But Walton said that Clark told him he was involved in all those. Well, he was involved. I mean, being present and being part of the planning and commission of this, even though he didn't touch the person, he'd still be involved, wouldn't he? But he, Walton specifically testified that what Clark told him is he was more than involved, that he was actually part of the person. He said, I also participated in the beating. I also participated in this criminal sexual assault. And in fact, the jury found Mr. Clark not guilty of the aggravated kidnapping based on the criminal sexual assault. And while the state says that could be because the medical testimony didn't confirm it, it also casts credibility on Mr. Johnson because Mr. Johnson clearly testified that this happened to him. So all of the state witnesses who testified to Mr. Clark's direct involvement in the offense or that Mr. Clark made these admissions, they had problems with credibility. And when the jury was weighing, so it is a close case because the jury had to weigh the credibility of these witnesses, weigh the evidence, and in doing so, had they weighed it and had doubts about whether Mr. Clark was more than just nearly present during the offense, these elaborate schemes of these co-conspirator acts of constituted element, which included this elaborate scheme of bribery of taking Mr. Johnson down to Justin Keenan's attorney's office, forcing him, bribing him to file an affidavit, retracting his story, hiding him in an apartment, giving him drugs. And then Mark Clark's alleged effort at concealment two months later, which involved plans to murder Mr. Johnson. Certainly, if the jury had any doubts of whether Mr. Clark was anything more than merely present, they could have used this evidence to impute those illicit acts to him, and that could have tipped the scale against Mr. Clark and allowed the jury to find him guilty based on this improper evidence. For these reasons, because Mr. Clark was denied a fair trial by an improperly instructed jury, and a jury that was contaminated by this improper evidence of co-conspirator statements, we would ask that this court reverse its convictions and remand for a new trial. Thank you. Let me just ask you one question before you leave. Sure. As far as the proximity and time, from your perspective, is there a bright line anywhere? I guess, I mean, the cases don't really analyze where the line is. But again, from the cases that I cite, I guess, you know, maybe five days is too long. Anywhere past five days is too far out to say that it's now part of the duration, or during the pendency of the original conspiracy, the original meeting of the minds. Okay. Thank you. Thank you, Counsel. You will have time for rebuttal. Thank you. Ms. Campbell, you may proceed. Your Honors, I'm Diane Campbell. I'm arguing on behalf of the people today. I'm going to briefly address the speedy trial issue that Justice Spence raised. And I will refer the court to People v. Kleiner. And I note that on pages 20 to 21 of my brief. And in particular, on 21, I mention that in Kleiner, which is an Illinois Supreme Court case, they allow the admission of later testimony. And when I was going back to prepare for the argument, I looked at the exact timeline for that. And in Kleiner, the offense was, I believe, February 17th or 18th of 1988. A statement that day was found admissible. And then the court also finds statements from March of 1988 to be admissible. And then the most telling factor, I think, for our argument is that they allow in statements from March of 1989, which is a year and a month approximately after the offense. They find in that case that they're related to the efforts. It's a murder for hire offense. And these later statements are dealing with the murderer attempting to get payment, which includes. Does that go to be more a dependency of the offense? Not the concealment of it? No, the court says in Kleiner that the murder or the offense doesn't end with the murder on February 17th. Whereas in our case, the offense pretty much ended at the end of the day. Well, the court law or the case law says that concealment is, in fact, an element of it. And in this case, we're not dealing with an indefinite period. But in Kleiner, they were not dealing with concealment in any way, shape, or form. Well, true. They found that the payment was part of the offense. That's what made it murder for hire. The remuneration, yeah, because it was for murder for hire. In this case, I think the concealment is part because we're dealing with a finite period of time, which is only two months. And there is active engagement in the concealment through it because Johnson is hiding from the defendants. They find him. They secrete him in a motel room. They bribe him to go and make the affidavit. When we talk about they, I mean they doesn't necessarily mean this defendant. That's why the proximate in time element is there to ensure that there is an ongoing conspiracy after the fact. Well, part of the difference between, like, this case and Kleiner is that the charge here is, or this case and some of the others cited, is that this is a conspiracy case. So you're not just proving aggravated kidnapping. You're proving that the defendant is part of the conspiracy to do this crime. And part of that is he's engaging with the other co-defendants afterwards to conceal it. Where's the proof of that? Some of the statements, I believe you referred to his admission where he uses we, you know, messed him up with, I believe, maybe kidnapping. That was the statement by somebody else attributed to the defendant. The defendant never made that statement to anyone other than the informant, correct? Then a better example perhaps would be, is it Willie Walton? When the defendant is in jail and he's talking to Willie Walton and Willie is going to be getting, he gets released January, I think, 15th or something like that. And he's offered to help the defendant solve his problem. And he's given a telephone number. And when he gets out, he will go and call, is it maybe the defendant's brother or something? And then get information regarding how they can solve the problem of Johnson testifying against them. So there is, in fact, active engagement by the defendant. That was Walton's testimony. Yes. Never, again, not the defendant's statements. Correct. But, and one of the points that my opposing counsel made was that some of the witnesses had credibility problems. And all that information was brought forth on rigorous cross-examination by defense counsel. The jury was fully aware of those credibility problems when they assessed the evidence and found the defendant guilty. I'll kind of move into the. Getting back to the harmless error, though, is it a close case or not? I mean, if we're talking about this evidence that may have tipped the scale, this co-conspirator evidence that may have tipped the scale, certainly the jury heard the credibility evidence in the issues. But, you know, looking at all this together, is it a close case or not? I don't think so. Because in order to even think that it's a close case, you have to assume the defendant's theory that he was merely present at the crime. And in this case, that's clearly not so because, first of all, they arrive at the gas station in the van. He's with the group. They get out. They seize the defendant. They get back into the van. You keep saying the defendant never got out of the van. I believe there's testimony that. I think the victim was the one who testified the defendant never got out of the van. Okay, then he is in the van. He remains in the van. They go to the house. They're beating up the defendant also in the van. Again, they. They go to the house. The testimony defendant was never involved in the beating. Correct. But he goes to the house with them, and he's the true renter with his front, who's the victim who rents it. He's in the circle surrounding the defendant in the kitchen. He does not actually do any of the physical blows that injure the defendant. But then they sort of huddle the defendant into the van again. They take the defendant to the scene where he is dropped off after the offense. So the defendant isn't merely present when they're kidnapping at the gas station. He's in continuous contact. He's associating with the group. They're moving from. They've got at least three distinct spots if you don't include, you know, the beatings they take in the van between the spots. Is there a case law that says that if you're present, merely present at multiple places, that that elevates it? On my brief at page 17, I cite to some cases talking about attachment to a group, and that's clearly what the defendant has done here. He is mobile with them through the sequence of places in a van. But that's your position? Yes. I'd also like to point out with the co-conspirator statements, it's an abuse of discretion standard, and this court should defer to the trial court's findings. It heard all the testimony as to whether or not the statements should or should not be admissible. As I mentioned, it is a finite period of time. It's just two months until the police secure the presence of Mr. Johnson and remove him from their sort of protective custody into the police's custody. Some of the statements, such as that by Paulus, is made two days after the offense. The other ones range in time from, I think, there's one statement that's made around Thanksgiving, and that's to Art Buzzard, and that, I believe, is by the defendant. He says he's leaving town because the police are looking for him, that he's going to turn himself in after Thanksgiving. I don't know that the defense is attacking statements specifically made by the defendant because those are admissions. I think we're talking about these other issues of things that Mark Clark was doing and threatening to kill the victim and moving him around and getting the affidavit signed and all that. I think that's what we're talking about. There are various statements that the defendant is, in fact, aware that they're getting the affidavit. I believe he mentions that in his awareness. Is that enough? If you tell me, do I have to close my ears so that I'm not going to be subject to those statements? Well, I think you also look at his brother's statements where they're concealing the victim in the apartment. And I think clearly that is the group of conspirators. As I said— But what you said was because the defendant was aware of what they were doing, he is now responsible for those statements. He's in jail, right? He is. There's no contact between him and his brother. His brother never comes to visit him. I'm not sure if there's telephone—I mean, Mr. Walton says that the defendant knows from his brother. Right. Again, that's Mr. Walton's statement. Right. And how do we connect that to the defendant? Because you also have Mr. Walton getting out with a telephone number where he can— Telephone number doesn't help me. Okay. How do we know that's—where did Walton get that information that the defendant knows? Does he get it from Clark or does he get it from the defendant? And if he got it from the defendant, when and how? He got it from the defendant in conversations with the defendant while the two are jointly in jail prior to Walton's release January 15th. So this all had occurred before Walton gets out of jail. Correct. And then after Walton gets out, he attempts to pursue, and the police at that point say, you know, don't pursue anything more. We've gotten a hold of Mr. Johnson again. They actually located him with some information from Art Buzzard. So conveniently, everything that Walton said is never verified because don't bother calling. Could have been a phone number he made up. There's nothing one way or the other in the record. Is that correct? I'm trying to recall all the specifics of the testimony, and there's so many different statements. I don't think there is. Okay. No. And Mr. Johnson is recovered, what, about mid-January? Yes. January 14th or 10th? I can't recall. I think maybe the 15th or the 17th somewhere in that. Thank you. Do you have any comment on the speedy trial issue? I do. For the speedy trial issue, the first period of time is the initial, I believe it is, the initial period of time from when the defendant is requesting his specific counsel. Although the state didn't oppose that in the trial court, I did cite decliner, which indicates that the appellate court or the reviewing court, when it's clear on the record that it should have been attributed to the people can do so when the issue is raised on review. It was continued for arraignment, correct? Correct. And an indictment that wasn't filed until several weeks later. Traditionally, when a defendant has been seeking specific counsel and proceedings are delayed until he can get either retained or specific appointed counsel, the time has always been attributed to the defendant. And here his request is he's had a particular defense attorney that was representing him in other proceedings, and he wants that same attorney to represent him in these proceedings. But there's a possibility of a conflict in this particular case. So at his express direction and intention, he asks that things be delayed until he can ascertain whether he can get that specific attorney. So this is opposed to some of the others where the withdrawal might have been initiated by counsel rather than defendant. Here it's at the defendant's express request that there is a delay so he can get this specific trial counsel. And then for the DNA delay, the courts look at these sorts of situations on the particular circumstances of the case. Where's the state's diligence here? The state's diligence is they sent in the request right away and specified on an information sheet that Johnson was the only one that bled at the scene, so they sent in his swap. In May, they get confirmation that there's DNA on the bottle. At that point, they are not aware that the lab wants additional DNA samples from the code. How could that be? Don't they deal with this lab week in, week out, month in, month out? I'm sure this is not the only DNA case. No one thought to ask? No one thought to make a phone call? I think at this point, they thought that they were working on it because they got confirmation that it was there. At this point, it's not a matter of great urgency. At this point, it's about six months, and they said the DNA backlog is typically six to eight months. Well, that's on the person's testimony, not everybody's. Now, on May 25th, the state agreed to set a trial date of June 30th. That was well within this hypothetical nine months. And you also have to factor in that the state can go to trial without the DNA. They are trying to get the DNA because they're trying to cover any potential Brady issue where the defendant comes back and asks for a person or something. So they did this out of the goodness of their heart just to make sure the defendant had all the possible good evidence it could need? I would not say that it was quite that altruistic. It could potentially raise information that they can use, but excuse me? The defendant never asked for the DNA testing. I don't believe so. In fact, I believe he was opposing getting some of the additional sample swabs from the co-defendants, so that was part of the additional delay and then getting the lab to do the subsequent work. But I think we also have to look at the fact that the trial judge made the finding not once, but I think at least twice, that the state didn't exercise due diligence. And I think your honors have all come from the trial court and know that the judge there had a pretty good analysis of the pace of the trial, the urgency of the proceedings. Here they heard the different prosecutors talk about the efforts they had made. And I think particularly starting September 6th, which is a month before the trial date, the state is looking into the evidence and they become aware that there's a problem with the DNA. So there's a flurry of phone calls on September 6th. On September 8th, they actually go to the DNA lab to try and spur things on. When they're aware that the particular chemist is going to go on vacation, they request that someone else do the work. So at that point, they are diligent and very vigorous. They were diligent for that week. That's the month, I think. And that's a month before trial. So from November of the previous year when he's arrested until September of 2011, there's no contact at all between the state and the lab. There isn't in May when they become aware that there, in fact, is DNA evidence. And that's a contact from the lab to the state's time. Not from the state's attorney to the lab. True. But I would think that would clue them in that the lab is working on their case and sort of lull them into an expectation that something is going to happen with their evidence. Or maybe even generate a phone call. It could have. It certainly would have been preferable because then we perhaps wouldn't be here. But they look at due diligence in the context also of being ready at your trial date. And in this case, the state did not leave it until, you know, 119 days as in one of the other cases. Here, they're a month before trial. And that's when they find out that there's going to be a problem. And that's when they start to really follow up on it. So I think under these circumstances, you know, given the fact that their main evidence and witness is, in fact, Mr. Johnson, and this is not going to be, you know, the be-all and end-all of the case. They did, under these circumstances, exercise due diligence. Anything else? No? All right. Thank you, counsel. Thank you. Zekin, rebuttal argument? Your Honor, I'll start first with the co-conspirator's statements and counsel's argument that Kleiner actually allowed for a larger window to allow subsequent efforts at concealment. But Kleiner was very specific that that case was a murder for hire. In fact, cited another case, Byron, where the holding was that attempts to obtain proceeds, and that's what this was months later, is part of the original offense. I mean, it's unique in that regard, and it doesn't apply. The same holding doesn't apply to this case. What about counsel's argument that the case law that says associating with a group that is intent on committing violent acts upon another person, especially in this case and going with that group from place to place to place, weighs heavily in favor of finding harmless error. Should we find error regarding these co-conspirator statements? I think those are factors to consider as to whether the defendant shares the common purpose of the principal offenders. But in this case, on the other hand, counsel downplays the evidence that was presented that supported Mr. Clark's theory of mere presence, and there's plenty. First of all, it's undisputed that he never physically touched Mr. Johnson. And as to the going from place to place to place, actually there's conflicting evidence as to that. In fact, there is no evidence that he was initially at the gas station where he was first apprehended. There's no evidence? There's no evidence of that. Then Patrick Brown drove him to this church parking lot. At that point, a van shows up, and Patrick Brown testifies that Aaron Clark is in the van, but he says that he's so scared that he basically runs off. And Michael Johnson gave conflicting statements to the police about when Aaron Clark joined the scene. First he said, yes, he was there at the church parking lot. He never said he was at the gas station. He said, yes, he was there at the church parking lot. But when he identified a photo of Mr. Clark in a lineup, he said Mr. Clark had not arrived until they were at Mr. Clark's home later. Why were they beating this guy up? Why were the principal offenders beating him up? Because Mr. Johnson testified that he stole drugs from Mr. Clark. But he also testified before the grand jury. He made statements. I'm sorry. I'm not as clear on this. He also made statements to the police that he stole cocaine, which Justin Keenan, the principal offender who did beat him up, the cocaine was Justin Keenan's. So that could go along with support of the defense counsel's, the defendant's theory that Justin Keenan was the ringleader of all this, and he was the one exacting revenge upon Mr. Johnson. I mean, these are all credibility issues that go to. But the defendant did make statements to these individuals that this victim had stolen drugs from him. Not to one person, but to two separate individuals. Two separate individuals who had their own agendas for testifying the way they did, who themselves had credibility issues. It was not just that he stole the marijuana plants, but they were not just the defendant's property. They were the defendant and the defendant's brothers. That's right. That's right. So there was credible evidence, and it's to support the defendant's theory. And the standard for determining whether there's harmless error here is whether the jury may have relied on the improper co-conspirator's evidence in determining Mr. Clark's guilt. And based on the fact that he presented credible evidence that he was merely president, there were credibility issues with the state's witnesses. These elaborate schemes that should not have been admitted against him certainly could have tipped the scales against him and certainly could have caused the jury to find him guilty. And I guess the only other thing I would say is to the speedy trial in terms of the due diligence that occurred between May 2nd and September 8th. On May 2nd, the lab contacted the state to notify them that they had DNA and for permission to consume the DNA. And then they hear nothing from the state until September. I mean, there's just no explanation for this gap of four months of not contacting them except for the fact that the state presumed that things were going along as planned and that the lab was going ahead and testing. But as I cite in my briefing, People v. Exxon, that presumption is not enough to show due diligence. Isn't one of the keys that whether the state began its efforts to locate the evidence before the speedy trial time was run? That's a factor, but... And here the speedy trial time ran mid-October and they started their efforts in late August or early September, correct? Correct, but the reason that they had to ask for a continuance was because they exercised no due diligence before. The reason that they had to extend the speedy trial term was because they didn't exercise due diligence during those four months. And belatedly, they scramble and ask for this continuance. And that's the only reason that they had to go beyond the speedy trial term. If the trial court found no due diligence, then the state would have just gone with the trial without it. That's right, but... Well, by asking for it and putting themselves... Basically, you know, if we find differently, then they're out of luck because they asked for more time instead of just going to trial without the evidence. They asked for more time, but implicit in that asking for more time is to show that they had all along, due diligently, had made efforts to obtain the evidence. If they didn't do that, then yes, the trial court abused its discretion in granting the continuance. The mere fact that they asked it is not enough. I have a question for you. You just said a few minutes ago that on May 2nd... Yes. ...the lab requested permission to consume the sample. Yes, I mean that... And that request remained unanswered until September when this flurry of activity takes place? That's my understanding of the record. There's nothing that happens between May 2nd and September 8th or the first week of... Well, the state says the last week of August, first week of September. Permission to use the sample was given on 9-13. Does that sound about right? Yes. And there's also evidence that doesn't even fit in this where, you know, even in September, the lab wasn't done with fingerprint testing as well. But, you know, that, again, the state doesn't indicate, the state was unaware of that apparently as well. And that, but that doesn't factor into this specific continuance that they asked for.  Thank you, Your Honor. I'd like to thank both the attorneys for their argument today. The case will be taken under advisory with a decision rendered in due course. May I adjourn?